Charles C. Weller (SBN: 207034)
legal@cweller.com
CHARLES C. WELLER, APC
11412 Corley Court
San Diego, California 92126
Tel: 858.414.7465
Fax: 858.300.5137

Attorney for Plaintiff Nicole Flick

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

NICOLE FLICK, *individually and on behalf of all those similarly situated*,

                                *Plaintiff*,

*v.*

ARCHON VITAMIN LLC dba PlantFusion, *a Delaware limited liability company,*

                              *Defendant*.

No. **'25CV1359 AJB SBC**

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Nicole Flick ("Plaintiff"), individually and on behalf of all others similarly situated in the state of California, by and through undersigned counsel, hereby brings this action against Archon Vitamin, LLC dba PlantFusion ("PlantFusion" or "Defendant"), alleging that its Mushroom + Protein Powder ("the Products"), which are manufactured, packaged, labeled, advertised, distributed, and sold by Defendant, are misbranded and falsely advertised because they feature deceptive protein claims on the front label and misrepresent the percent of Recommended Daily Value of protein contained in each serving, and upon information and belief and investigation of counsel alleges as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PARTIES**

1.     Plaintiff Nicole Flick is and at all times relevant was a citizen of the state of California, domiciled in San Diego, California.

2.     Defendant Archon Vitamin LLC dba PlantFusion is a Delaware limited liability company with its principal place of business in Edison, New Jersey. On information and belief all decisions regarding formulation and labeling of the Products are made at this principal place of business and none of the members of the limited liability company are residents or citizens of the state of California.

**JURISDICTION AND VENUE**

3.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, Pub. L. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28 of the United States Code); specifically, under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

4.     Plaintiff seeks to represent Class members who are citizens of states and countries different from the Defendant.

5.     The matter in controversy in this case exceeds $5,000,000 in the aggregate, exclusive of interest and costs.

6.     In addition, "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

7.     In the alternative, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Defendant because this action arises out of and relates to Defendant's contacts with this forum.

9.    Those contacts include but are not limited to sales of the Products directly to commercial and individual consumers located in this district, including Plaintiff; shipping the Products to commercial and individual consumers in this district, including Plaintiff; knowingly directing advertising and marketing materials concerning the Products into this district through wires and mails, both directly and through electronic and print publications that are directed to commercial and individual consumers in this district; and operating an e-commerce web site that offers the Products for sale to commercial and individual consumers in this district, as well as offering the Products for sale through third-party e-commerce websites, through both of which commercial and individual consumers residing in this district have purchased the Products.

10.    Defendant knowingly directs electronic activity and ships the Products into this district with the intent to engage in business interactions for profit, and it has in fact engaged in such interactions, including the sale of the Products to Plaintiff.

11.    Defendant also sells the Products to retailers and wholesalers in this district for the purpose of making the Products available for purchase by individual consumers in this district.

12.    Plaintiff's losses and those of other Class members were sustained in this district.

13.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this district.

14.    Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because this Court maintains personal jurisdiction over Defendant.

## FACTUAL ALLEGATIONS

15.    Millions of Americans consume specific amounts of protein in order to lose or maintain weight, build muscle, and meet fitness goals.[1] The past several decades have seen not only the rise of protein-centered diets such as the Atkins, paleo, or keto diets—which require

---

[1] Heather J. Leidy, "Increased Dietary Protein as a Dietary Strategy to Prevent and/or Treat Obesity," Mo. Med. (Jan./Feb. 2014), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC6179508/.

adherents to carefully track "macros," including protein—but also increased evidence that a protein-heavy diet can be critical to supporting muscle growth, making weight training more efficient, and helping with weight loss and maintenance. In fact, "several clinical trials" have found that a high-protein diet "not only reduces body weight (BW), but also enhances body composition by decreasing fat mass while preserving fat-free mass (FFM)," more than "both low-calorie and standard-calorie diets."[2]

16.    Central to the tracking of protein consumption is accurate nutritional labeling of foods and dietary supplements. As noted by U.S. Food and Drug Administration ("FDA") Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Indeed, FDA recommends relying on Nutrition Facts Labels as primary "tool for monitoring consumption of protein."[3]

17.    Plaintiff Nicole Flick is one of those millions of Americans. She tracks her protein intake and takes a daily protein powder supplement to ensure she gets enough protein in her diet. She does so in order to maintain her weight and meet fitness goals. As such, ensuring that she eats at least the Recommended Daily Value of protein—and more generally that she is able to accurately track her protein intake—is important to Ms. Flick.

18.    As part of this effort and to assist in meeting her protein consumption goals, Plaintiff purchased the Products (vanilla flavor) from Amazon.com (order 114-5287345-2983427) on or about January 21, 2025.

A.    Protein Quality and PDCAAS.

19.    Amino acids are the building blocks of proteins, whether that protein is derived from animals or plants. Both animal and plant proteins are composed of approximately 20 amino

---

[2] Jaecheol Moon & Gwanpyo Koh, "Clinical Evidence and Mechanisms of High-Protein Diet-Induced Weight Loss," 29 J. OBESITY & METABOLIC SCI. 166-73 (2020), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC7539343/.
[3] FDA, "Interactive Nutrition Fact Label – Protein," *available at* https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/assets/InteractiveNFL_Protein_October2021.pdf.

acids, which are essential for the synthesis of body proteins and other important nitrogen-containing compounds such as creatine, peptide hormones, and some neurotransmitters.

20.    There are nine amino acids that are not created by the human body: histidine, isoleucine, leucine, lysine, methionine, phenylalanine, threonine, tryptophan, and valine, called "essential amino acids." Human beings must consume these amino acids by digesting meat, animal products, plants, and other protein-rich foods that contain them.[4]

21.    However, not all proteins are created equally. Various protein sources contain all of the nine essential amino acids, while other protein types contain fewer of these amino acids. Thus, the *quantity* of protein by itself does not tell the full story of protein from a human nutritional standpoint. A protein's *quality* is also critical because humans cannot fully digest or utilize some proteins, while other proteins are missing essential amino acids.

22.    Protein sources that contain all or almost all of the essential amino acids are considered higher-quality proteins. These higher-quality proteins also tend to have a higher "bioavailability," a term connoting the digestibility or the absorptive quality of a protein, *i.e.*, the ease with which the protein can be accessed and used by the human body in building muscle and undertaking other tasks.[5]

23.    Scientists have developed a measure of protein quality called the Protein Digestibility Corrected Amino Acid Score, or PDCAAS. The relevant FDA regulations refer to this as the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii).

24.    The PDCAAS method combines a protein source's amino acid profile and its percent digestibility into a discount factor ranging from 0.0 to 1.0 that, when multiplied by the total protein quantity, shows how much protein in a product is actually available to support

---

[4] M.J. Lopez & S.S. Mohiuddin, "Biochemistry, Essential Amino Acids." In StatPearls [Internet] (2025), *available at* https://www.ncbi.nlm.nih.gov/books/NBK557845/.

[5] *See generally* Claire Gaudichon & Juliane Calvez, "Determinants of amino acid bioavailability from ingested protein in relation to gut health." 24 CURR. OP. CLIN. NUTR. & METABOLIC CARE 55 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC7752214/; Stephan van Vliet, Nicholas Burd & Luc van Loon, "The Skeletal Muscle Anabolic Response to Plant- versus Animal-Based Protein Consumption." 145 J. NUTR. 1981 (2015), *available at* https://pubmed.ncbi.nlm.nih.gov/26224750/.

human nutritional requirements.[6] The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii).

25.    Proteins have a range of PDCAAS. Animal-derived proteins such as cow's milk, eggs, and whey have PDCAAS at or near 1.0. Soy also has a PDCAAS that is close to 1.0, while other plant-derived proteins have PDCAAS scores below 1.0—often much lower than 1.0—such as 0.7 for peas, 0.61 for brown rice, and 0.42 for wheat.[7]

26.    A PDCAAS of 1.0 signifies that the protein is a complete protein with optimal digestibility. A PDCAAS of 0.5 means that only half of the protein in that product is actually available to support human protein needs. If a product with a PDCAAS of 0.5 contained 10 grams total protein per serving, the "corrected" amount of protein as described in 21 C.F.R. § 101.9(c)(7)(ii) would be only 5 grams per serving. Thus, protein products can vary widely in their ability to support human protein needs—even between two similar products with the same total amount of protein.

**B.    PDCAAS and Food Labeling**

27.    Because the PDCAAS method makes the differences in bioavailability among different types of proteins apparent to consumers, the method has a critical role to play in nutritional labeling under relevant FDA regulations.

28.    The FDA and other federal bodies set "Recommended Daily Values" for nutrients such as protein, which is the amount of that nutrient that the FDA recommends that a normal adult (or some other specified demographic) should consume every day to preserve their health and eat a balanced and nutrition diet. In the Nutrition Facts panel of foods (or the "Supplement Facts" panel of a dietary supplement), food manufacturers report the percentage of the

---

[6] Gertjan Schaafsma, "The protein digestibility-corrected amino acid score," 130 J. NUTR. 1865S-67S (2000), *available at* https://pubmed.ncbi.nlm.nih.gov/10867064/.

[7] *Id. See also* Joyce Boye, Ramani Wijesinha-Bettoni & Barbara Burlingame, "Protein quality evaluation twenty years after the introduction of the protein digestibility corrected amino acid score method," 108 BR. J. NUTR. S183–S211 (2921), *available at* https://www.cambridge.org/core/journals/british-journal-of-nutrition/article/protein-quality-evaluation-twenty-years-after-the-introduction-of-the-protein-digestibility-corrected-amino-acid-score-method/51E5092761DA6004F1B081B204AAAB99.

Recommended Daily Value ("%DRV") provided by a serving of the food or supplement. *See* FDA, "Daily Value on the Nutrition and Supplement Facts Labels," *available at* https://www.fda.gov/food/nutrition-facts-label/daily-value-nutrition-and-supplement-facts-labels.

29.     A manufacturer is not required (as a general matter) to report a %DRV for a food's protein content in the Nutrition or Supplement Facts panels. A manufacturer can simply leave the %DRV of protein blank—and many manufacturers do.

30.     But FDA regulations state that if a Nutrition Facts or Supplement Facts panel expresses the protein content of a food in terms of %DRV, that disclosure must conform to and incorporate the PDCAAS method. That is, the %DRV then must be "equal to the actual amount of protein (gram) per serving multiplied by the amino acid score corrected for protein digestibility," which "shall be determined by methods given in sections 5.4.1, 7.2.1, and 8.00 in 'Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation.'" 21 C.F.R. § 101.9(c)(7)(ii). *See also* Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2302, 2344 (Jan. 6, 1993) (when a nutritional label presents %DRV of protein it "must represent the corrected amount of protein based on its PDCAAS").

31.     These regulations are grounded in a recognition that 10 grams of pea or rice protein per serving does not offer the same %DRV of protein per serving as 10 grams of whey protein, because of whey protein's 1.0 PDCAAS versus the much lower PDCAAS of pea and rice proteins. If the %DRV of a food containing such proteins is reported, it must be "corrected" by applying the PDCAAS of the proteins in the manner set forth in 21 C.F.R. § 101.9(c)(7)(ii).

32.     There is a second instance in which manufacturers are required to report a PDCAAS-corrected %DRV in nutritional panels. Some foods or supplements make a "protein claim," which is a claim outside of the Nutrition Facts or Supplement Facts panel that "characterize[s] the amount of protein in the products." *Nacarino v. Kashi Company*, 77 F.4th

1201, 1205 (9th Cir. 2023). These are often front label claims that a food contains "40 grams protein per serving," or the like.

33.     When a food makes a protein claim outside of the Nutrition Facts or Supplement Facts panel, the food manufacturer no longer has a choice whether or not to report a PDCAAS-corrected %DRV. In that instance, the manufacturer **_must_** disclose the PDCAAS-corrected %DRV in the panel. *See* 21 C.F.R. § 101.9(c)(7)(i). *See also Nacarino*, 77 F.4th at 1209 ("[I]f a product label includes a protein claim *outside* the [Nutrition Facts panel], section 101.9(c)(7)(i)'s trigger provision requires the manufacturer to also include the PDCAAS-corrected percent daily value *inside* the NFP") (emphasis in original); 1211 ("The text and structure of the FDA regulations demonstrate that Defendants' protein claims could be misleading if … the products did not display the quality-adjusted percent daily value in the NFP.").

34.     FDA has stated in guidance to the public that "Food manufacturers may *voluntarily* list the %D[R]V of protein per serving on the Nutrition Facts label, but they are *required* to list the %D[R]V of protein if a statement is made on the package labeling about the health effects or the amount of protein (for example, 'high' or 'low') contained in the food."[8]

35.     The reason for this requirement—that a food making a protein claim must display a PDCAAS-corrected %DRV in the Nutrition or Supplements Facts panel—is to allow "consumers to readily identify foods of low protein quality." Food Labeling: Mandatory Status of Nutrition Labeling and Nutrient Content Revision, Format for Nutrition Label, 58 Fed. Reg. 2,079, 2,102 (1993). FDA's regulations recognize this requirement as "an important part of nutrition labeling." *Id*. at 2,103.

36.     The regulations set forth FDA's expert conclusion that (1) when manufacturers tout an amount of protein on the front label, that amount is likely to be material to purchasing decisions, even though reasonable consumers may not know the total amount of protein they

---

[8] FDA, "Interactive Nutrition Fact Label – Protein," *available at* https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/assets/InteractiveNFL_Protein_October2021.pdf (emphases in original)

need to ingest on a daily basis to meet their Recommended Daily Value, and (2) not all proteins are the same in their ability to meet human nutritional requirements, so a simple statement about the number of grams does not actually inform consumers about how much usable protein they are receiving or how many servings they might need to consume meet their consumption goals.

37.    Reporting of an accurate %DRV is especially important to the class of "protein-conscious consumers" who purchase protein-fortified products such as the Products, especially those who count protein macros or who otherwise track their protein intake. *Nacarino,* 77 F.4th at 1212. Consumers rely on nutritional labeling to make informed decisions regarding the amount of a food or supplement they must consume to achieve their protein consumption goals, and to contextualize protein claims made on front label or otherwise outside of the nutritional panels.

38.    A protein claim on a food or supplement is deceptive and misleading to consumers if it is not accompanied by a PDCAAS-corrected %DRV disclosure in the Nutrition Facts or Supplement Facts panel, because it gives reasonable consumers the impression that all of the protein in a product is high-quality protein that is bioavailable to consumers.

39.    PlantFusion makes a protein claim on the Products' front label (or "principal display panel") that the Products contain 18 grams of protein per serving:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    40.    The Products use pea, amaranth, and quinoa proteins as the sole protein sources.

18  The PDCAAS of such proteins is significantly less than 1.0.

19    41.    Because of the protein claim on the front label, PlantFusion is required under 21

20  C.F.R. § 101.9(c)(7) to report a PDCAAS-corrected %DRV in the Supplement Facts panel of

21  the Products.

22    42.    It does not. Instead, the Supplement Facts panel on the Products states that the 18

23  grams of lower-quality protein in Products provides 36 percent of the Recommended Daily

24  Value, as shown here:

25
26
27
28

## Supplement Facts

Serving Size 2 Scoops (32 g)
Servings Per Container about 14

|  | Amount per serving | % Daily Value |
|---|---|---|
| Calories | 130 |  |
| Total Fat | 2.5 g | 3%* |
|    Saturated Fat | 0.5 g | 3%* |
| Total Carbohydrate | 4 g | 1%* |
|    Dietary Fiber | 1 g | 4%* |
| Protein | 18 g | 36% |
| Calcium | 27 mg | 2% |
| Iron | 4.8 mg | 27% |
| Sodium | 460 mg | 20% |

43.     The protein claim on the principal display panel of the Products is deceptive and misleading to reasonable consumers because that claim is not clarified and contextualized by the disclosure of the quality-adjusted percent daily value in the Supplement Facts panel.

44.     Likewise, the protein claim in the Supplement Facts panel is deceptive and misleading to consumers because that claim does not report a PDCAAS-adjusted %DRV.

**C.    Plaintiff Reasonably Relied on Defendant's Labelling Statements.**

45.     Labels are the chief means by which food product manufacturers convey critical information to consumers, and consumers have been conditioned to rely on the accuracy of the claims made on these labels.

46.     Consumers including Plaintiffs especially rely on label claims made by food product manufacturers such as Defendant, as they cannot confirm or disprove those claims simply by viewing or even consuming the Products.

47.     Further, federal law and corresponding state law and regulations both reflect and create reasonable consumer expectations concerning the contents of foods and beverages. That is, consumers have been conditioned to rely on the %DRV disclosures in a Nutrition Facts or

Supplement Facts panel when determining how much of a food product they need to consume to obtain a specific amount of protein in their diet.

48.      Plaintiff reviewed the front label and Supplement Facts panel on the Products prior to his purchase, as well as the other statements described herein, and reviewed the statements regarding protein being made in those places. Consumers such as Plaintiff who viewed the Products' labels reasonably understood the Products to contain 18 grams of fully bioavailable, high-quality protein, comprising 36 percent of the Recommended Daily Value of protein. This representation was false.

49.      Consumers including Plaintiff reasonably relied on these label statements such that they would not have purchased the Products from Defendant if the truth about the Products was known, or would have only been willing to pay a substantially reduced price for the Products had they known that Defendant's representations were false and misleading.

50.      In the alternative, because of its deceptive and false labelling statements, Defendant was enabled to charge a premium for the Products relative to key competitors' products, or relative to the average price charged in the marketplace.

51.      In addition to being unlawful under the FDA regulations cited herein, Defendant's prominent protein claim on the front of the package, in the absence of any statement of the corrected amount of protein per serving expressed as a %DRV in the Supplement Facts panel, is also likely to mislead reasonable consumers. Unless they are told otherwise, consumers reasonably expect that Defendant's Products will actually provide the full amount of ***_bioavailable_*** protein per serving claimed on the front of the package and stated in the protein quantity section of the Supplement Facts panel, *i.e.*, that the Products contain high quality proteins. But Defendant's products do not. Instead, they consist of low-quality proteins that are not bioavailable.

52.      Had Defendant included a statement of the corrected amount of protein per serving in the Supplement Facts panel, as it was required to do under federal and state law, that

disclosure would have revealed that less than half of the total protein quantity in the Products is useable by the human body, and that the Products contain low quality proteins.

53.    That information was material to reasonable consumers, especially the class of protein-conscious consumers who are the target market of the Products. The absence of this information also allowed Defendant to charge a price premium to consumers including Plaintiff.

54.    Plaintiff suffered economic injury by Defendant's fraudulent and deceptive conduct as stated herein, and there is a causal nexus between Defendant's deceptive conduct and Plaintiff's injury.

55.    All flavors of the Products make the same protein claims described herein and sell for roughly the same price. Plaintiff is therefore an adequate representative of the Class despite not having purchased all flavors of the Products.

## CLASS ACTION ALLEGATIONS

56.    Plaintiff brings this action individually and as representative of all those similarly situated pursuant to Federal Rule of Civil Procedure 23 on behalf of all consumers in the state of California who purchased the Products within four years prior to the filing of this Complaint.

57.    Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

58.    Plaintiff reserves the right to alter the Class definition, and to amend this Complaint to add additional Subclasses, as necessary to the full extent permitted by applicable law.

59.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as individual Class members would use to prove those elements in individual actions alleging the same claims.

60.     **Numerosity – Rule 23(a)(1)**: The size of the Class is so large that joinder of all Class members is impracticable. Plaintiff believes and avers there are thousands of Class members geographically dispersed throughout the state of California.

61.     **Existence and Predominance of Common Questions of Law and Fact – Rule 23(a)(2), (b)(3)**: There are questions of law and fact common to the Class. These questions predominate over any questions that affect only individual Class members. Common legal and factual questions and issues include but are not limited to:

    a.  Whether the marketing, advertising, packaging, labeling, and other promotional materials for Defendant's Products is misleading and deceptive;

    b.  Whether a reasonable consumer would understand Defendant's protein claim to indicate that the Products contain 18 grams of fully bioavailable high-quality protein and provide a specific percentage of the Daily Recommended Value of protein (36 percent), and reasonably relied upon that representation;

    c.  Whether Defendant was unjustly enriched at the expense of the Plaintiff and Class members;

    d.  Whether Defendant breached an express warranty;

    e.  the proper amount of damages;

    f.  the proper scope of injunctive relief; and

    g.  the proper amount of attorneys' fees.

62.     Defendant engaged in a common course of conduct in contravention of the laws Plaintiff seeks to enforce individually and on behalf of the Class. Similar or identical violations of law, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate this action. The common questions will yield common answers that will substantially advance the resolution of the case.

63.     In short, these common questions of fact and law predominate over questions that affect only individual Class members.

64.     **Typicality – Rule 23(a)(3)**: Plaintiff's claims are typical of the claims of the Class members because they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

65.     Specifically, all Class members, including Plaintiff, were harmed in the same way due to Defendant's uniform misconduct described herein; all Class members suffered similar economic injury due to Defendant's misrepresentations; and Plaintiff seeks the same relief as the Class members.

66.     There are no defenses available to Defendant that are unique to the named Plaintiff.

67.     **Adequacy of Representation – Rule 23(a)(4)**: Plaintiff is a fair and adequate representative of the Class because Plaintiff's interests do not conflict with the Class members' interests. Plaintiff will prosecute this action vigorously and is highly motivated to seek redress against Defendant.

68.     Furthermore, Plaintiff has selected competent counsel who are experienced in class action and other complex litigation. Plaintiff and Plaintiff's counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

69.     **Superiority – Rule 23(b)(3)**: The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for at least the following reasons:

   a.   the damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct such that it would be virtually impossible for the Class members individually to redress the wrongs done to them. In fact, they would have little incentive to do so given the amount of damage each member has suffered when weighed against the costs and burdens of litigation;

b.  the class procedure presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and supervision by a single Court;

c.  the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant; and

d.  the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would be dispositive of the interests of other Class members or would substantively impair or impede their ability to protect their interests.

70.    Unless the Class is certified, Defendant will retain monies received as a result of its unlawful and deceptive conduct alleged herein.

71.    Unless a class-wide injunction is issued, Defendant will likely continue to advertise, market, promote, and sell its Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Class will continue to be misled, harmed, and denied their rights under the law. Defendant continues to mislabel the Products in the manner described herein and sell them to the consuming public. Defendant would like to purchase the Products and other products sold by Defendant in the future, but cannot currently do so because he cannot rely on the Products' labelling, given the deceptions regarding protein quality found there. An injunction prohibiting future deceptive labelling is therefore warranted and would provide Plaintiff and the Class relief.

72.    Furthermore, Plaintiff has not merely alleged an "informational" injury, but has also alleged that Defendant has been enabled to charge a price premium for the Products. Plaintiff has therefore alleged that compliance with federal and state regulations regarding the accurate reporting of protein content and quality in the Products would cause a decrease in the price of the Products at which Plaintiff and members of the Class would be willing to buy the

Products. As a result, Plaintiff has alleged more than simply an interest in Defendant telling the truth on its labels, but an economic injury that further supports prospective injunctive relief.

73.    **Ascertainability**. To the extent ascertainability is required, the Class members are readily ascertainable from Defendant's records and/or its agents' records of retail and online sales, as well as through public notice.

74.    Defendant has acted on grounds applicable to the Class as a whole, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

**COUNT 1**
**VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT,**
**CAL. CIV. CODE § 1750 *et seq.***

75.    Plaintiff realleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

76.    Plaintiff is a "consumer" within the meaning of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1761(d).

77.    The sale of Defendant's Products to Plaintiff and Class members was a "transaction" within the meaning of the CLRA, Cal. Civ. Code § 1761(e).

78.    The Products purchased by Plaintiff and Class members are "goods" within the meaning of the CLRA, Cal. Civ. Code § 1761(a).

79.    As alleged herein, Defendant's business practices are a violation of the CLRA because Defendant deceptively failed to reveal facts that are material in light of the protein claims that were made by Defendant on the principal display panel of its Products.

80.    Defendant's ongoing failure to provide material facts about its Products on its labels violates the following subsections of Cal. Civ. Code § 1770(a) in these respects:

a.    Defendant's acts and practices constitute misrepresentations that its Products have characteristics, benefits, or uses which they do not have;

b.    Defendant misrepresented that its Products are of a particular standard, quality, and/or grade, when they are of another;

c. Defendant's acts and practices constitute the advertisement of goods, without the intent to sell them as advertised;

d. Defendant's acts and practices fail to represent that transactions involving its Products involve actions that are prohibited by law, particularly the use of misleading nutritional labelling; and

e. Defendant's acts and practices constitute representations that its Products have been supplied in accordance with previous representations when they were not.

81.    By reason of the foregoing, Plaintiff and the Class have been irreparably harmed, entitling them to injunctive relief.

82.    Pursuant to Cal. Civ. Code § 1782, Plaintiff notified Defendant in writing of the particular violations of the CLRA described herein and demanded Defendant rectify the actions described above by providing complete monetary relief, agreeing to be bound by its legal obligations and to give notice to all affected customers of their intent to do so.  Plaintiff sent this notice by certified mail to Defendant, at least 30 days before the filing of this Complaint.

83.    Pursuant to Cal. Civ. Code §§ 1770 and 1780, Plaintiff is entitled to enjoin publication of misleading and deceptive nutritional labels on Defendant's Products and to recover reasonable attorneys' fees and costs.

**COUNT 2**
**UNJUST ENRICHMENT**

84.    Plaintiff realleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative in the event that Plaintiff has an inadequate remedy at law.

85.    Under California law, a claim for unjust enrichment "describe[s] the theory underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Astiana v. Hain Celestial Grp., Inc.* (9th Cir. 2015) 783 F.3d 753, 762 (quoting 55 *Cal. Jur.* 3d *Restitution* § 2). Thus, when a plaintiff alleges unjust enrichment, the Court should "construe the cause of action as a quasi-contract claim seeking restitution." *Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal.App.4th 221, 225. Courts in

-18-

California have allowed unjust enrichment and CLRA claims to proceed in the alternative. *See Scheibe v. Livwell Prods., LLC,* No. 23-cv-216, 2023 WL 4414580, at *8 (S.D. Cal. 2023).

86. Defendant, through its marketing and labeling of the Products, misrepresented and deceived consumers by misrepresenting that the Products provided 18 grams of fully bioavailable protein that constituted 36 percent the Recommended Daily Value of protein.

87. Defendant did so for the purpose of enriching itself and it in fact enriched itself by doing so.

88. Consumers conferred a benefit on Defendant by purchasing the Products, including an effective premium above their true value. Defendant appreciated, accepted, and retained the benefit to the detriment of consumers.

89. Defendant continues to possess monies paid by consumers to which Defendant is not entitled.

90. Under the circumstances it would be inequitable for Defendant to retain the benefit conferred upon it and Defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience.

91. Plaintiff seeks disgorgement of Defendant's ill-gotten gains and restitution of Defendant's wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

92. Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact as a result of Defendant's actions as set forth above.

## COUNT 3
## BREACH OF EXPRESS WARRANTY

93. Plaintiff realleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

94. Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted that the Products contained 18 grams of fully bioavailable protein that constituted 36 percent of the Recommended Daily Value of protein.

95.     Defendant's express warranties, and its affirmations of fact and promises made to Plaintiff and the Class and regarding the Products, became part of the basis of the bargain between Defendant and Plaintiff and the Class, which creates an express warranty that the Products would conform to those affirmations of fact, representations, promises, and descriptions.

96.     The Products do not conform to the express warranty that the Products contain 18 grams of fully bioavailable protein because they contain a lower-quality protein with a PDCAAS of less than 1.0.

97.     As a direct and proximate cause of Defendant's breach of express warranty, Plaintiff and Class members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew the truth about the Products' protein claim; (b) they paid a price premium based on Defendant's express warranties; and (c) the Products do not have the characteristics, uses, or benefits that were promised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court grant the following relief against Defendant:

a.   Certifying the Class;

b.   Declaring that Defendant violated the CLRA and/or was unjustly enriched and/or breached an express warranty;

c.   Ordering an award of actual, compensatory, or statutory damages, in an amount to be proven at trial;

d.   Ordering an awarding of injunctive relief as permitted by law, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

e.   Ordering Defendant to pay reasonable attorneys' fees and litigation costs to Plaintiff;

f.   Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g.   Such other relief as the Court may deem just and proper.


TRIAL BY JURY IS DEMANDED ON ANY COUNTS SO TRIABLE.


Respectfully submitted,


/s/ *Charles C. Weller*
Charles C. Weller (Cal. SBN: 207034)
Attorney for Plaintiff

May 28, 2025

CLASS ACTION COMPLAINT